Filed 5/26/26  P. v. Seevers CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087801 |
| Plaintiff and Respondent, | (Super. Ct. No. BAF2300798) |
| v. | |
| RICHARD EUGENE SEEVERS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Jason M. Armand, Judge.  Reversed and remanded.

Deanna L. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Christopher P. Beesley and Caelle Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

1

Dillon E.[1] disappeared in August 2021 and was never seen or heard from again. His body was never discovered, no crime scene was identified, and there was no physical evidence to indicate what happened to him.

Three years later, a jury convicted Richard Eugene Seevers of second degree murder based primarily on the testimony of witnesses who claimed Seevers had admitted to his involvement in killing Dillon, but these witnesses gave significantly different accounts of how and where Seevers said the murder occurred.

Investigator Darryl Robertson of the Riverside County Sheriff's Department was the lead investigator who developed the case against Seevers and testified as the prosecution's final witness at trial. During his testimony, Investigator Robertson expressed his personal opinions on the veracity of two of the key prosecution witnesses and on Seevers's guilt. Defense counsel did not object to any of this opinion testimony.

We conclude Seevers's defense attorney provided ineffective assistance of counsel by failing to object to this inadmissible opinion testimony. On this unusual record, Seevers has established both deficient performance and prejudice under the *Strickland* standard for ineffective assistance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) Accordingly, we reverse the judgment and remand for a new trial.

FACTUAL AND PROCEDURAL BACKGROUND

After last being heard from on the evening of August 26, 2021, Dillon disappeared without a trace. Although police eventually came to suspect that

---

[1]    In the interest of privacy, we refer to the victim and relevant witnesses by their first names.

Dillon had been killed, Dillon's body was never located, and no physical evidence explained his disappearance.

A roommate testified that Dillon was packing to go on a hike the last time he saw him. Searches in the area where Dillon often hiked did not provide any clues. Dillon was last heard from when his girlfriend communicated with him over Facebook Messenger on the evening before his disappearance.

Seevers was eventually identified as a murder suspect about a year and a half later, based primarily on what witnesses reported to law enforcement that Seevers said to them about his involvement in Dillon's murder. In addition, GPS information from a device associated with Seevers's Google account was located near, but not at, Dillon's residence in Cabazon during the early morning hours of August 27, 2021.

Law enforcement began focusing on Seevers as a suspect after Jennifer W. told Dillon's brother in January 2023 that she had information about Dillon's murder. Jennifer is Seevers's former daughter-in-law and was in a relationship with Tommy H., who at one point was suspected of having killed Dillon. The communication between Jennifer and Dillon's brother took place because Tommy first contacted Dillon's brother and suggested that he speak with Jennifer. Jennifer testified, "Tommy moved away because he was afraid to go to jail for all this. Something he didn't do. And I related to Tommy what I had found out or what I had heard from everybody. And Tommy, I guess, confided in the brother." Jennifer then told Dillon's brother that the murderer was not who he thought it was and that Seevers was involved. She also complained that Tommy was being blamed for Dillon's murder.

3

As a result, Investigator Robertson interviewed Jennifer in June 2023. Jennifer told Investigator Robertson that Seevers had admitted to killing Dillon.

According to Jennifer's trial testimony, when she got out of jail on December 28, 2021, four months after Dillon's disappearance, she went to spend the night at Seevers's residence. That night, while Jennifer was telling Seevers about her relationship with Tommy, Seevers said, "Oh, you ain't got to worry about him much longer," "he's going down for some stuff that I did." Seevers stated to Jennifer that his girlfriend, Ashley G., told him that Dillon had raped her. As a result, Seevers called his friend Frank Mansfield and told Mansfield that "they were gonna go get Dillon." Seevers and Mansfield went to Dillon's house, where Seevers lured Dillon outside, and Mansfield shot Dillon in the head. The men then put Dillon's body in Mansfield's vehicle and disposed of it at a location called "Dead Man's Curve."

Jennifer testified that Seevers threatened to kill her if she did not keep quiet about what he told her. She became afraid and left the house around 4:00 a.m. According to Jennifer, she stole Seevers's gun from his safe before she left. Jennifer explained, "I had to have some kind of security that he wasn't gonna come get me. If he doesn't have a gun, how is he gonna kill me?" Jennifer testified that she did not have phone service on her cell phone at the time. However, she also testified that after she took the gun, Seevers called her on a cell phone while she was driving the next day and demanded that she return the gun. Instead, she sold the gun to an unrelated person.

In addition, Jennifer testified about a conversation she said she had

4

with Mansfield approximately two weeks after she spoke with Seevers.[2] Specifically, Mansfield told Jennifer that he had learned from Seevers that Dillon had raped Ashley. Seevers and Mansfield then went to Dillon's house, where Mansfield lured Dillon outside at Seevers's request. Seevers came up behind Dillon and shot him in the head. The men put Dillon's body in Mansfield's vehicle and disposed of it at Dead Man's Curve. As Jennifer summarized, Seevers and Mansfield described the murder in the same way, except with "opposite positions" regarding which man lured Dillon outside, and which man shot him.

Jennifer's trial testimony was inconsistent with statements she made to Investigator Robertson when he interviewed her. First, Jennifer told Investigator Robertson that Seevers said it was him, not Mansfield, who shot Dillon, and he bragged about doing so. Specifically, as Investigator Robertson described, Jennifer "said that [Seevers] confronted [Dillon] and he called Ashley a f[*]cking slut and a liar, so [Seevers] got mad and shot him." Second, Jennifer said that after Seevers told her about the murder, she stayed at Seevers's residence for another month, instead of leaving at 4:00 a.m. in fear, as she testified at trial.

When confronted on cross-examination with statements she made to Investigator Robertson, Jennifer testified that a man named "Scotty" helped dispose of Dillon's body, but she did not explain where she learned that fact.

---

[2] Mansfield was charged along with Seevers for Dillon's murder, but Mansfield did not participate in Seevers's jury trial because a doubt was declared as to his mental competency. Before Jennifer's testimony about Mansfield's statements, the trial court held a hearing under Evidence Code section 402 regarding admissibility of the statements. The trial court ruled that Mansfield's statements to Jennifer were admissible as declarations against Mansfield's penal interest. (Evid. Code, § 1230).

Defense counsel also confronted Jennifer with a statement she made to Investigator Robertson, in which she claimed to have been asked to help clean Mansfield's vehicle immediately after the murder. Defense counsel asked how that could have happened in August 2021 when Jennifer was in jail at the time. In response, Jennifer explained that the request to help clean the vehicle was made at a later date, after someone named "Daisy" took the vehicle from Mansfield.

After speaking with Jennifer, Investigator Robertson arrested Ashley on an outstanding warrant issued in Idaho and interviewed her three times while she was in custody. At first, Ashley denied that anything happened between her and Dillon. During the second interview, on July 21, 2023, which was audio recorded, Investigator Robertson questioned Ashley at length about Dillon's murder. He also asked her to confirm his theory that Mansfield killed Dillon on his own initiative, without direction from Seevers, after Seevers told him that Dillon had raped Ashley. As Investigator Robertson described that theory to Ashley: "[Seevers] didn't do anything wrong other than vent to [Mansfield] about what happened. [Mansfield] took it upon himself . . . to do what he did to Dillon." Investigator Robertson told Ashley, falsely, that he had recovered Mansfield's vehicle, which contained Dillon's DNA. He also told Ashley that GPS evidence from Mansfield and Seevers put them together at Dillon's house at the time of the murder. Investigator Robertson informed Ashley that she could help Seevers if she confirmed that Mansfield was the one who killed Dillon, based on Seevers's report that Dillon had raped Ashley. Investigator Robertson also told Ashley that if she gave him information, he would help her by making a call to Idaho to try to allow her to stay in California.

6

Ashley then stated that she had a consensual sexual relationship with Dillon, but that she falsely told Seevers that Dillon had sexually assaulted her. Ashley heard Seevers "venting" on the phone to Mansfield, and she heard Seevers state that he was going to tell Dillon's father about what happened.[3] However, later, Seevers told her that "[Mansfield] did something that he didn't ask him to do," that Mansfield shot someone, and that Seevers had tried to stop it. According to Investigator Robertson, Ashley nodded her head "in the affirmative" when asked whether both Mansfield and Seevers were present during the shooting. Ashley told Investigator Robertson that Seevers "didn't know [Mansfield] was going there with a gun. He's always trying to tell people not to get a freaking gun, all the time."

During Ashley's third interview with Investigator Robertson approximately two days later, she told him that she had not been truthful in the previous conversation, and that she had "made it all up." When Ashley testified at trial, she continued to maintain that she had lied to Investigator Robertson: "I told him what he told me." "[H]e kept pressuring me and pressuring me and pressuring me, and finally, I gave in. I told him what he wanted to hear."

As a result of information given to him by Jennifer, Investigator Robertson also interviewed Mary L., who is Seevers's cousin. As Mary told Investigator Robertson and later testified at trial, when she was visiting from out of town in November 2021, her brother Scotty W. asked her to drive him to a remote location where she saw what looked like a body being taken out of a large hole in the ground and placed in a truck. Mary stated that within the next few days she spoke with Seevers, who told her that the body belonged to

---

[3] Ashley explained that Dillon's father was one of Seevers's best friends.

7

someone who "did something to Ashley and had to be dealt with" or "someone who messed with Ashley." Mary also told Investigator Robertson that "to her understanding" Scotty killed the person whose body she saw. At trial, Mary explained that she was terrified to testify because she was afraid that Scotty would kill her and her family. She said, "I'm more scared of Scott [W.] than I am of [Seevers]. Because [Seevers's] not a murderer." She stated, "I can't believe for one second that [Seevers] killed this guy," and that "[Seevers] is not a killer" and "wouldn't harm anybody."

Seevers was arrested on August 4, 2023. Shortly thereafter, Investigator Robertson provided Seevers with a piece of paper that purported to show a DNA match for Seevers, Mansfield and Dillon had been found in Mansfield's vehicle. That representation was false because, in fact, Mansfield's vehicle had been scrapped in 2022.

In August 2023, Shea C., a long-time acquaintance of Seevers, was together with Seevers in custody. In mid-August 2023, Shea asked to speak with law enforcement to provide information about Dillon's murder that he had purportedly learned from Seevers. Shea had a history of providing information to law enforcement, and he asked for early release from custody in return for providing information about Dillon. Shea told Investigator Robertson that Seevers told him he killed Dillon on August 19 or August 20 by strangling him at Seevers's residence in Banning, and that Mansfield, Tommy, and one other person were involved. Shea also said that Seevers told him that "the only mistake he made was leaving his DNA in the vehicle." Shea provided information about where Dillon's body was located, but law enforcement searched that area and did not find anything.

Shea testified at trial and described what Seevers told him about the murder, including that "the deceased had slept with not only his girlfriend,

8

but the girlfriends of a couple other people. And that he was known for that. And that was the reason he was killed." He also testified that Seevers described the details of how Dillon was strangled, explaining that "the other defendant," presumably referring to Mansfield, "kind of toyed with [Dillon] as they killed him. That they were kind of strangling him and then letting off and strangling him and letting off." Shea testified that Seevers said "they had moved the body in a truck. That's why the DNA was in the vehicle." According to Shea, Seevers asked him to tell law enforcement that Mansfield and Tommy, rather than Seevers, were involved in the murder.

In September 2023, Donny W. was in custody with Seevers. Donny was well known to Seevers, having lived with him for a period of time. Donny had also been romantically involved with Jennifer in 2020, and also (according to Jennifer) at some point after Dillon disappeared. While in custody, Donny contacted law enforcement with information about Dillon's murder. Specifically, he told Investigator Robertson that he had witnessed a fight, during which Tommy killed Dillon. Investigator Robertson questioned that story, told Donny he knew it wasn't true and threatened to charge Donny as an accessory after the fact to murder for giving him a false statement. Donny then recanted the statement and said Seevers told him to talk to law enforcement with that information. Donny said that he had witnessed a fight between Tommy and Dillon, but he did not know that Dillon died as a result, although Seevers wanted him to say that is what happened.

In a subsequent interview, Donny told Investigator Robertson that after Donny complained to Seevers about having him lie on his behalf, Seevers had admitted to killing Dillon by shooting him three times (in the head, chest and arm) and that the killing happened in Mansfield's garage.

9

Donny also provided information about where Dillon's body was buried, but law enforcement did not find Dillon's body there.

Donny testified at trial and confirmed what he told Investigator Robertson during the different interviews. According to Donny's trial testimony, Seevers said he shot Dillon three times (after Mansfield "snatched him up") because Dillon "took advantage of" Ashley, and Seevers was "pissed."

At trial, the People presented GPS tracking information about the location for a device associated with one of Seevers's Google accounts. According to that information, early in the morning on August 27, 2021, shortly after Dillon was last heard from, the device traveled from Seevers's home in Banning to Cabazon, which is the city where both Mansfield and Dillon resided, approximately one half of a mile from each other. The device was located at Mansfield's home for a while, but the device was never at Dillon's residence, although it came close. Moreover, the jury heard testimony that the location information from a device associated with Mansfield did not match Seevers's information "the entire time" and was "not identical."

The jury convicted Seevers of second degree murder. The trial court imposed a prison sentence of 15 years to life.

## DISCUSSION

A. *Defense Counsel Was Constitutionally Ineffective for Failing to Object to Statements Made During Investigator Robertson's Testimony*

Seevers contends the judgment must be reversed because Investigator Robertson improperly offered lay opinions on the veracity of particular statements made by certain witnesses and on the question of Seevers's guilt. Alternatively, Seevers argues that if his evidentiary claims have been

10

forfeited by defense counsel's failure to object to these portions of Investigator Robertson's testimony, his counsel provided constitutionally ineffective assistance in failing to object.

As an initial matter, we agree with the People that Seevers's evidentiary objections are forfeited because defense counsel did not object to any of the testimony that Seevers now challenges on appeal. "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353.) Accordingly, "it is . . . generally the case that a defendant forfeits an argument on appeal where he fails to object at all to the evidence in the trial court." (*People v. Flinner* (2020) 10 Cal.5th 686, 726.) Seevers does not identify any circumstance that might except him from the general forfeiture rule.

We must therefore decide Seevers's alternative claim of ineffective assistance of counsel. To prevail on his ineffective assistance claim under the Sixth Amendment, Seevers must establish that (1) his counsel's performance was deficient, and (2) he was prejudiced as a result. (*Strickland*, *supra*, 466 U.S. at p. 687.) Deficient performance is established by showing that the attorney's representation "fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) Under *Strickland*'s prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

11

In assessing whether an attorney's performance was deficient, "a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Further, "competent counsel may often choose to forgo even a valid objection. '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1197 (*Riel*).) Thus, " 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence' . . . [¶] Nonetheless, deference to counsel's performance is not the same as abdication. . . . '[I]t must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 675, citations omitted.) We may conclude, on direct appeal, that counsel's performance was deficient if " '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*People v. Jasso* (2025) 17 Cal.5th 646, 676 (*Jasso*).)

Here, as we will explain, there is " 'no satisfactory explanation' " for counsel's silence (*Jasso, supra,* 17 Cal.5th at p. 676), as certain statements made during Investigator Robertson's testimony "would have compelled competent counsel to object" (*Riel, supra*, 22 Cal.4th at p. 1198; see also *Jasso*, at p. 678 [inquiring whether "trial counsel had no conceivable reason to proceed in this fashion"]).

1.    *Opinions on Witness Veracity*

The first category of statements at issue are those that, according to Seevers, were improper because they offered Investigator Robertson's opinion on the veracity of statements made by Jennifer and Mary.

Investigator Robertson testified as a lay witness. " 'A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony.' " (*People v. Jones* (2017) 3 Cal.5th 583, 602; see also Evid. Code, § 800.) However, "[l]ay opinion about the veracity of particular statements by another is inadmissible on that issue." (*People v. Melton* (1988) 44 Cal.3d 713, 744 (*Melton*).) "[T]he reasons are several. With limited exceptions, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence. Qualified experts may express opinions on issues beyond common understanding . . . , but lay views on veracity do not meet the standards for admission of expert testimony. A lay witness is occasionally permitted to express an ultimate opinion based on his perception, but only where 'helpful to a clear understanding of his testimony[,]' . . . i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed. . . . Finally, a lay opinion about the veracity of particular statements does not constitute properly founded character or reputation evidence . . . , nor does it bear on any of the other matters listed by statute as most commonly affecting credibility . . . . Thus, such an opinion has no 'tendency in reason' to disprove [or prove] the veracity of the statements." (*Ibid.*, citations omitted.) "[A] lay witness may not express an opinion about the veracity of another person's statement because the statement's veracity is for the jury to decide." (*People v. Houston* (2012) 54 Cal.4th 1186, 1221.)

13

a. *Testimony About the Veracity of Jennifer's Statements*

First, with respect to Jennifer, during cross-examination, defense counsel asked Investigator Robertson certain questions that established inconsistencies between Jennifer's trial testimony and her statements to Investigator Robertson. On redirect examination, the prosecutor asked Investigator Robertson about the circumstances under which Jennifer spoke with him. Investigator Robertson explained that the interview occurred in his car, where Jennifer "told the story." The testimony then proceeded as follows:

"Q. And with that, was what she told you largely consistent with the information she provided here in court?

"A. Yes.

"Q. And was there anything about what she said here in court compared to what she said in her conversation with you that concerned you?

"A. Not at all.

"Q. And when you say, 'not at all,' if you can elaborate on that?

"A. Sure. A lot of times when you interview people, they remember different things over time or that conversation that they have with the person stimulates other thoughts or things that they might not have told me or vice versa. There might be things that she told me then and now that we sit here in court are a little more detailed or lack of detail as well."

A few questions later, the prosecutor asked, "[W]hat was her emotional demeanor as she was telling you about the information that [Seevers] provided her?" Investigator Robertson answered, "The entire time she was very nervous. *And as she started telling her truth*, she became very emotional." (Italics added.)

As we evaluate this testimony, it amounts to Investigator Robertson's opinion about the veracity of the statements that Jennifer made to him and

14

at trial about what Mansfield and Seevers said to her regarding Dillon's murder. By testifying that he believed Jennifer's trial testimony was consistent with what she told him and that he was "[n]ot at all" concerned about any inconsistencies, Investigator Robertson communicated to the jury that he had concluded that Jennifer's statements about her conversations with Mansfield and Seevers were credible and true despite any inconsistencies. By next stating that Jennifer "started telling her truth" during her interview, Investigator Robertson underscored that he believed Jennifer was being truthful. In so doing, Investigator Robertson improperly gave an opinion on an issue that should have been left to the jury.

      b.     *Testimony About the Veracity of Mary's Statements*

When the prosecutor questioned Investigator Robertson about his interview with Mary, the following exchange occurred:

> "Q. When you talked with her, did she ever deny any statements made by the defendant?
>
> "A. Initially, she was reluctant to talk to me, due to her fear. After we got past the initial portion of the interview, *she then became truthful.*
>
> "Q. And in that, did she confirm that [Seevers] told her that the body that was moved was someone who messed with Ashley?
>
> "A. Yes." (Italics added.)

By testifying that Mary "became truthful" during her interview, Investigator Robertson offered his opinion about the veracity of Mary's statement that Seevers said the body was "someone who messed with Ashley."

      c.     *The Testimony Was Improper and Objectionable*

Investigator Robertson's testimony opining on the veracity of Jennifer's and Mary's statements is similar to the improper testimony in *People v.*

15

*Julian* (2019) 34 Cal.App.5th 878, 889–890. There, "[c]ounsel asked [the detective] if [the child victim] was 'honest with you' in making her claims. The detective answered, 'Yes, Sir.' This solicited inadmissible opinion evidence, which bolstered the People's case and undermined [the defendant's] defense." (*Id.* at p. 889.) Similarly, in *People v. Sergill,* (1982) 138 Cal.App.3d 34, 41 (*Sergill*), two police officers testified they believed a child was truthful when she disclosed molestation to them. The testimony was improper because "the officers' opinions on the child's truthfulness during their limited contacts with her did not have a *reasonable* tendency to prove or disprove her credibility and were therefore not relevant," and "may well have caused the jury to place undue emphasis on the officers' testimony," resulting in "the usurpation of the jury's function as fact finder." (*Id.* at pp. 40, 41.)

In some circumstances, there are permissible reasons to admit lay testimony opining on the veracity of a witness's statement. As relevant, "an officer's testimony with respect to whether he believed a witness may be admitted to assist the jury in understanding the actions of the police." (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1027 [cleaned up].) However, the testimony at issue here was not offered for that reason. Most obviously, Investigator Robertson's testimony (on redirect) that he was "[n]ot at all" concerned about the inconsistencies between Jennifer's trial testimony and her statements to him did nothing to explain the course of the investigation, as they concerned the significance of Jennifer's statements *at trial*, after the investigation was already concluded. In addition, Investigator Robertson's description of Jennifer as "telling her truth" when he interviewed her and his statement that Mary "became truthful" after first being reluctant to speak to him were not made to explain the course of the law enforcement investigation. Investigator Robertson could just as well have explained his

16

investigation by using neutral words that indicated Jennifer and Mary both gave substantive statements to him that implicated Seevers, along with a description of Mary's and Jennifer's demeanor. Under that approach, jurors would have understood how Mary's and Jennifer's statements shaped the police investigation but would have been left to decide issues of credibility for themselves. (See *Sergill, supra,* 138 Cal.App.3d at p. 40 [officer testimony on witness veracity was improper because the "officers were able to describe their interviews with the [witness] in concrete detail and their opinions or conclusions as to her truthfulness were not 'helpful to a clear understanding of [their] testimony' "]; *Melton, supra,* 44 Cal.3d at pp. 744–745 [the prosecutor improperly elicited testimony from a defense investigator that indicated the investigator's assessment of the witness's credibility when the investigator "was able to describe his interviews with [the witness] in detail, leaving the factfinder free to decide [the witness's] credibility for itself, based on such factors as his demeanor and motives, his background, his consistent or inconsistent statements on other occasions, and whether his statements to [the investigator] had the essential 'ring of truth' "].)

2.      *Opinions on Guilt*

The second category of statements at issue are those that Seevers describes as offering an opinion on his guilt.

" 'A consistent line of authority in California as well as other jurisdictions holds a witness cannot express an opinion concerning the guilt or innocence of the defendant. . . . [T]he reason for employing this rule is not because guilt is the "ultimate issue of fact" to be decided by the jury. Opinion testimony often goes to the ultimate issue in the case. [Citation.] Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as

17

competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' " (*People v. Duong* (2020) 10 Cal.5th 36, 60; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)  Similarly, "the same rationale which prohibits the witness from expressing an opinion on the meaning of statutory terms or the guilt of the defendant also prohibits the witness from expressing an opinion as to whether a crime has been committed." (*People v. Torres* (1995) 33 Cal.App.4th 37, 47 (*Torres*) [witness improperly expressed the opinion the crimes committed were robberies].)  Our inquiry is whether a witness has offered testimony that is "*tantamount* to expressing an opinion as to defendant's guilt." (*People v. Ward* (2005) 36 Cal.4th 186, 210, italics added; see also *People v. Vang* (2011) 52 Cal.4th 1038, 1048; *Duong,* at p. 61.)

Investigator Robertson was in charge of investigating the case.  After eliciting testimony from Investigator Robertson about how the investigation proceeded after Jennifer stated that Seevers had killed Dillon, the prosecutor engaged in the following questioning of Investigator Robertson:

"Q.  And so as the investigation continued, as you mentioned a few days ago, did you continue to keep an open mind?

"A.  Absolutely.

"Q.  And was that important for the terms of your investigation?

"A.  Yes.  It always is important.

"Q.  And with that, as you spoke with all the individuals referenced here this morning and during the course of this case, did you continue to do so?

"A.  Yes.

"Q.  Did you continue to look for evidence that may exonerate [Seevers]?

"A.  I did.

"Q.  Frankly, did you find any?

"A.  No."

In addition, in the course of his testimony, Investigator Robertson was asked several times about the significance of a statement that Seevers purportedly made to Shea. Specifically, Shea reported to Investigator Robertson that Seevers said "the only mistake he made was leaving his DNA in the vehicle." Investigator Robertson testified that Seevers's statement was "significant" because "[t]he only way [Seevers] would believe that is if . . . *he committed the homicide*." (Italics added.) Investigator Roberston explained, "if a person was really concerned about their DNA being left behind, it would show some type of involvement, major participant and involvement in the homicide and *it would* [*let*] *me know that . . . I had the right person*." (Italics added.) According to Investigator Robertson, the statement "*let me know that . . .* [*Seevers*] *was the person involved in the homicide*," and that Seevers "was extremely concerned or worried about the *one mistake that he made in the murder of Dillon* [*E.*]" (Italics added.)

Through this testimony, Investigator Robertson improperly expressed an opinion on Seevers's guilt. Investigator Robertson's statement that he did not find any evidence to exonerate Seevers is similar to the testimony determined to be improper in *People v. Spence* (2012) 212 Cal.App.4th 478. There, the prosecutor asked a question to a medical expert that was purportedly in the form of a hypothetical, but in substance referred to the facts of the case. The prosecutor asked, " 'if someone by the name of [D.] says that she is sexually assaulted by someone by the name of James Spence [i.e., the defendant], is there any evidence that you tested in this case that contradicts that story?' " (*Id.* at pp. 507, 509.) The witness replied, " 'So I don't have any—I don't have any results that would be inconsistent with that. There may be another explanation, but I don't have any results inconsistent with—all of the DNA that I have ends up having some

19

consistency with the DNA test from Mr. Spence.' " (*Id.* at p. 507.) As the appellate court interpreted this questioning, "the medical expert arguably was asked to testify directly about the guilt of Spence, since the question posed named him and essentially asked whether he had any meritorious defense in the evidence, or was guilty." (*Id.* at p. 510.) The questioning was improper because it "tended to interfere with the jury's ability to decide the ultimate issues, including the probativeness of the laboratory tests, and also the credibility of D. in naming Spence as the accused." (*Ibid.*) Observing that the "question seemed to require the expert to speculate about the strength of the prosecution's case as a whole," and seemed to "unduly focus upon Spence as a presumptively guilty individual," the court concluded that the questioning was not permissible. (*Ibid.*)

The same situation exists here. By asking Investigator Robertson whether any evidence exonerated Seevers, the prosecutor improperly elicited testimony that commented on the strength of the case against Seevers and the issue of whether he was guilty of Dillon's murder. By responding that he found no exonerating evidence, Investigator Robertson expressed his personal opinion on evidence a factfinder could have viewed as exonerating, such as Jennifer's inconsistent statements, Donny's initial statement that Tommy was the killer, Mary's belief that Scotty was the killer, the witnesses' varying accounts of how and where Seevers purportedly said the murder occurred, Ashley's recantation of her original statement, and the fact that the GPS evidence did not place Seevers's device at Dillon's residence on the night Dillon disappeared.

Further, by accepting as true that Seevers told Shea he made a mistake in leaving his DNA in the vehicle, and then explaining to the jury that Seevers's statement established he "had the right person," Seevers

20

"committed the homicide," Seevers "was the person involved in the homicide," and Seevers was worried about a "mistake that he made in the murder," Investigator Robertson gave testimony tantamount to an opinion that Seevers was guilty of murdering Dillon. This testimony also improperly communicated to the jury that Investigator Robertson believed Shea was telling the truth about the statement he claimed Seevers made to him.

The People contend that the testimony about the information from Shea was permissible because it "was helpful for the jury to understand how Investigator Robertson connected Seevers to the victim's murder." We agree that if Investigator Robertson had limited his comments to explaining the information from Shea pointed to Seevers as a suspect to be further investigated, the testimony would have been permissible. (See, e.g., *People v. Virgil* (2011) 51 Cal.4th 1210, 1253–1254 [to explain how the defendant was identified as a suspect in a homicide, it was permissible for a detective to testify that a composite picture " 'kind of resembled' " the defendant and that the defendant had been seen in relevant locations].) However, Investigator Robertson did not limit his testimony in such a manner. Instead, he improperly testified that the information from Shea let him "know" that Seevers committed the murder.

3. *There Is No Satisfactory Explanation for Counsel's Failure to Object*

Having determined that portions of Investigator Robertson's testimony were objectionable because they either opined on witness credibility or opined on Seevers's guilt, we conclude that " 'there simply could be no satisfactory explanation' " (*Jasso, supra,* 17 Cal.5th at p. 676) for the failure of defense counsel to object.

21

To begin with, it is not a close question whether the testimony was improper. As we have explained, it is well established that testimony opining on witness credibility and on a defendant's guilt is inadmissible. Any competent defense attorney would have been aware of these settled legal principles. It should have been obvious to competent counsel that Investigator Robertson's statements were objectionable.

The People make the sweeping statement that "there are numerous tactical reasons why counsel may have abstained from objecting." However, the only reasons they suggest are that "[c]ounsel may have chosen not to emphasize the unfavorable testimony by objecting to it," "[o]r perhaps he wished to safeguard his credibility with the trial court by reserving objections for his strongest arguments." We are not convinced that either tactical reason is viable here.

Investigator Robertson's statements about witness credibility and Seevers's guilt were not unfavorable *facts* that defense counsel might choose to deemphasize by foregoing an objection. Instead, the statements were highly prejudicial *opinions* by the lead law enforcement official assigned to the case, which defense counsel had every reason to challenge and call into question. (See *Torres*, *supra*, 33 Cal.App.4th at p. 49 [when a police officer testified as to what crimes were committed by the defendant, "[g]iven the importance of the jury's determination on this issue" the court "perceive[d] no tactical advantage to defendant in allowing [the officer's] testimony to go unchallenged"].) If defense counsel wished to raise objections outside the presence of the jury so as not to highlight the improperly offered opinions, he could have done so by making a general objection and asking for a sidebar conference, during which he could have requested that the trial court instruct the jury to disregard the testimony because it is the role of the jury to

determine credibility and guilt. (See *id*. at pp. 48–49 ["counsel should have moved to strike and requested a curative instruction to the jury that they, not [the police officer witness], must determine what crimes were committed and whether defendant was guilty of those crimes"].) Defense counsel could also have asked the court to admonish the prosecution and the witness outside the presence of the jury not to present further inadmissible opinion testimony on witness veracity or guilt. Defense counsel could have accomplished this without highlighting the inadmissible opinion evidence. By doing nothing, defense counsel allowed the inadmissible opinion testimony to continue cumulating.

We are also not persuaded that defense counsel might have withheld an objection because he thought he would compromise his credibility with the court by doing so. As we have explained, defense counsel had well-founded objections available to him. No reasonable judge could have thought any less of defense counsel for making such an objection. Moreover, Investigator Robertson's testimony opining on Seevers's guilt and Jennifer's and Mary's credibility was so central to the issues at trial and so damaging to Seevers's defense that any competent counsel would have objected. We can conceive of no satisfactory explanation for defense counsel's failure to do so. Seevers has therefore satisfied the deficient performance prong of the *Strickland* standard. (Cf. *People v. Yates* (2018) 25 Cal.App.5th 474, 488 [finding on direct appeal no conceivable satisfactory explanation for defense counsel's failure to object to every instance in which prosecution experts related as true case-specific facts contained in hearsay statements].)

4.    *Prejudice*

The final question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different." (*Strickland, supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*)

In making that assessment, we first observe that Investigator Robertson was a central witness who held a special status as an experienced law enforcement officer assigned to investigate the case and examine the evidence. He was the lead investigator; he interviewed all the key witnesses; he was designated as the investigating officer and allowed to be present in the courtroom during trial; and the prosecution called him as its final witness to wrap up the entire case. Thus, Investigator Robertson's opinions on witness credibility, the absence of any exonerating evidence, and the conclusions to be drawn from Seevers's statement to Shea were likely to hold special weight for the jury and created a risk that the jury would abdicate its role as the arbiter of credibility and guilt. (See *People v. Rouston* (2024) 99 Cal.App.5th 997, 1012 ["Given Jankowski's status as a gang expert, the designated investigator who testified repeatedly throughout the trial, and a detective, 'the jury had every reason to look to [Jankowski] as a far better judge than they could be' regarding the reliability of other witnesses' testimony, and what inferences to draw from the prosecution's other evidence," so that "Jankowski, 'in essence, invited the jury to abdicate its duty to decide the issue' and defer to his assessment that [defendant] fired the ghost gun and shot [this victim] in the face"].)

The issues on which Investigator Robertson offered his opinion were strongly contested and pivotal to the result. Regarding Jennifer's and Mary's credibility, there were sound reasons for the jury to come to a different conclusion than Investigator Robertson about whether the statements of those witnesses should be credited. Jennifer told different stories at different

24

points in time. Among other things, Jennifer told Investigator Robertson that Seevers had boasted to her that he shot Dillon, after which Jennifer stayed at Seevers's residence for several weeks. In contrast, Jennifer testified at trial that Seevers told her that Mansfield shot Dillon, and hours after learning that fact, Jennifer left Seevers's residence in fear and did not return. Other parts of Jennifer's testimony called her credibility into question, including the fact that she claimed Seevers called her while she was driving after she took his gun, even though Jennifer testified that she did not have phone service at the time. The jury also learned Jennifer told Investigator Robertson that someone called and asked her to help clean up Mansfield's vehicle after the murder, even though she was actually in jail on the date that Dillon disappeared. And most significantly, Jennifer had a motive to falsely identify Seevers as Dillon's killer, as she was in a relationship with Tommy, who was considered a suspect and who initiated the contact with Dillon's brother.

Based on all of those considerations, it is reasonably probable that the jury would have come to a different conclusion about Jennifer's credibility had Investigator Robertson not given his opinion on the truthfulness of Jennifer's statements, including his statements that he was "[n]ot at all" concerned about the inconsistencies and she was "telling her truth." (See *Sergill*, *supra*, 138 Cal.App.3d at p. 41 [when "[t]he critical question in th[e] case was the child's credibility," but "[t]here were some inconsistencies in the child's several accounts of this incident, and between her version of what happened and her mother's," as well as interpersonal animosity that called motivation and credibility into question, police officer testimony opining on the child's credibility was prejudicial and required reversal].)

25

Further, had the jury not learned that Investigator Robertson considered Mary to be "truthful" when she told him Seevers said the body she saw was "someone who messed with Ashley," the jury might have been more reluctant to credit what Mary said. At trial, Mary explained that she was terrified of having to testify because of what her brother Scotty might do to her and her family. Mary made clear that there were things she was holding back and refusing to say, as shown by the following exchange between the prosecutor and Mary:

> "Q. When I was asking you questions about what [Seevers] told you, initially you said he didn't tell you anything. Do you recall that?
>
> "A. Yes.
>
> "Q. And were you scared to tell us what [Seevers] told you?
>
> "A. Yes.
>
> "Q. Why were you scared to tell us what [Seevers] told you?
>
> "A. I don't want to say. I can't say. I can't -- I can't say. I can't say. And I won't say. You can't make me say it. You can take me to jail, whatever. I'm not gonna say it. I'm not gonna say."

Given these circumstances, the jury may have been more likely to question the truth of Mary's statements if Investigator Robertson had not vouched for their veracity.

With respect to Investigator Robertson's testimony that Seevers's purported statement to Shea showed Seevers "was the person involved in the homicide" and was the "right person," a reasonable jury could have arrived at a different conclusion from the evidence. In giving that testimony, Investigator Robertson's implicit assumption was that Shea was being *truthful* in reporting what Seevers said to him. Investigator Robertson therefore concluded that Seevers was involved in the murder. However, the

26

jury was instructed that Shea was an in-custody informant. The jury was told that it should "[v]iew the statement or testimony of an in-custody informant against the defendant with caution and close scrutiny" and "should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits."

Apart from this instruction, other factors raised questions about Shea's credibility. The jury heard evidence that Shea asked for benefits in exchange for providing information to law enforcement, and that Shea provided information about the location of Dillon's body that appeared not to be true, as no body was found there. In addition, Shea also gave details about the murder that did not track the evidence or the claims of other witnesses.[4] Taken together, these considerations would cause a reasonable jury to exercise caution before deciding to credit Shea's statement about what Seevers said to him. However, because Investigator Robertson testified that Shea's statement showed Seevers was "the person involved in the homicide" and "the right person" there is a risk that the jury accepted that conclusion, delivered by an experienced and informed law enforcement officer, rather than deciding for itself whether to believe Shea's statements.

Finally, regarding Investigator Robertson's testimony that he found no evidence to exonerate Seevers (thus implying that Seevers was guilty), a reasonable jury could have viewed the evidence in a different manner if it was not tainted by Investigator Robertson's improper opinion. For one thing, the GPS evidence did not put Seevers's device at Dillon's residence on the

---

[4] Shea stated the killing was accomplished by strangulation in Banning at Seevers's house, and that it occurred on August 19 or 20, when Dillon had not yet disappeared.

night that Dillon disappeared, although it was located at Mansfield's house. The GPS evidence was therefore inconsistent with the version of events related through Jennifer, in which Seevers committed the killing at Dillon's house. If Seevers was at Mansfield's house on the night Dillon disappeared, that fact could be compatible with a scenario in which Seevers travelled to Mansfield's house after Dillon was killed but was not Dillon's killer. Further, more than one witness testified that Seevers was not the killer. Mary told Investigator Robertson that it was Scotty who killed Dillon, not Seevers. During one interview, Ashley told Investigator Robertson that Seevers and Mansfield were together when Dillon was shot, but she stated that Mansfield, not Seevers, was the shooter. She also explained that Seevers did not intend for Dillon to be killed. Ashley later recanted even that statement. The jury could have credited those witnesses and relied upon the GPS evidence to conclude that some of the evidence actually *did* exonerate Seevers. However, Investigator Robertson's testimony that he did not find any exonerating evidence may have foreclosed the jury from reaching that conclusion.

Significantly, other than Jennifer's, Shea's and Donny's statements implicating Seevers in the murder, there was no substantial evidence of Seevers's guilt. Dillon's body was never located, and no physical evidence showed that Seevers murdered him. Accordingly, the case against Seevers depended entirely on the credibility of Jennifer, Shea and Donny. Mary's statement, if credited, showed that Seevers at least had knowledge about the killing. However, each of those witnesses had significant credibility problems. We have already detailed the problems with Jennifer's and Mary's credibility. Shea's and Donny's credibility was questionable because they were in-custody informants, who were either seeking benefits from law enforcement (in the case of Shea) or threatened with prosecution (in the case

28

of Donny).  Further, Donny may have been motivated to lie based on his relationship with Jennifer.

Without Investigator Robertson's improper opinion testimony, a reasonable juror might have been skeptical of all the stories told by Jennifer, Donny and Shea because they varied so dramatically from one another.  As we have explained, Shea said the killing occurred at Seevers's house in Banning on August 19 or 20 by strangulation and the perpetrators included Tommy and a fourth person.  Donny stated that Seevers killed Dillon in Mansfield's garage by shooting him three times.  Jennifer said the killing was accomplished by a shooting after Dillon was lured outside his own home.  No physical evidence corroborated any of these varying accounts.

When, as here, a case turns on a question of witness credibility, improperly introduced evidence that bolsters the credibility of the prosecution's core witnesses supports a finding of prejudice.  (See *People v. Basuta* (2001) 94 Cal.App.4th 370, 390  [when a specific witness's "credibility was crucial to the prosecution's case," and "the prosecution's case could not tolerate a loss of the conflict over [the witness's] credibility," improper polygraph evidence "had a high potential to affect the jury's resolution of that issue," and thus established prejudice]; *People v. Lee* (2002) 95 Cal.App.4th 772, 792 [it was prejudicial error to admit evidence that "lent an unreasonable impression of credibility" to a witness who blamed the murder on the defendant when the prosecution's case was weak without that witness's statement].)

In sum, the case against Seevers was weak because it rested primarily on the inconsistent testimony of witnesses with motives to be untruthful, no physical evidence corroborated any of their stories or otherwise implicated Seevers, no body was ever found, and no crime scene was ever identified.

29

(See *In re Edward S.* (2009) 173 Cal.App.4th 387, 418 ["the case must be considered a close one because there was no eyewitness or physical evidence and the matter turned almost entirely on credibility"].) Although, in certain circumstances, an investigating officer's opinion on the defendant's guilt may "not have influenced the verdict . . . in light of the overwhelming evidence against defendant," that situation is not present here. (*People v. Riggs* (2008) 44 Cal.4th 248, 301.) Because the case against Seevers was based on such a precarious foundation, jurors could well have been influenced by Investigator Robertson's personal opinions as an experienced law enforcement officer who had spent countless hours on the investigation. It is therefore reasonably probable that Seevers would have obtained a more favorable result at trial if defense counsel had objected to Investigator Robertson's improper testimony opining on the veracity of Jennifer's and Mary's statements, identifying Seevers as the person who committed the homicide, assuring the jurors he knew he had "the right person," and concluding that no evidence exonerated Seevers.

We accordingly conclude that Seevers received constitutionally ineffective assistance of counsel, which requires reversal of the judgment and a remand for new trial.[5]

---

[5] Because we are reversing the judgment, we need not decide the other issue raised by Seevers regarding the admission of Mansfield's statements to Jennifer as a declaration against penal interest. We decline to exercise our discretion to decide this issue for the trial court's guidance on remand because it depends on the evidence before the court at the time of its ruling. Given the inconsistencies in Jennifer's pretrial statements and testimony and the other evidence, we cannot have any confidence that the state of the record will be the same if and when the issue arises again on retrial. Moreover, even if we were to conclude that the trial court's evidentiary ruling in the first trial was not an abuse of discretion, that would not necessarily require

DISPOSITION

The judgment is reversed and this matter is remanded for a new trial.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


KELETY, J.

---

the court to make the same discretionary ruling in a retrial.